673 F.Supp. 336 (1987)
UNITED STATES of America, Plaintiff,
v.
Eugene SLAY, et al., Defendants.
No. 86-67CR(1).
United States District Court, E.D. Missouri, E.D.
November 4, 1987.
*337 *338 David Rosen, Asst. U.S. Atty., St. Louis, for plaintiff.
Edward R. Joyce, St. Louis, Mo., and Bobby Lee Cook, L. Branch S. Connelly, Summerville, Ga., for defendant Slay.
Jim J. Shoemake, Kurt Odenwald, St. Louis, Mo., and Thomas M. Utterback, Washington, Mo., for defendant Tyus.
Barry Short, St. Louis, Mo., for defendant Cullen.
Burton Shostak, St. Louis, Mo., for defendant Zych.

MEMORANDUM
NANGLE, Chief Judge.
By way of indictment (the "Archway" indictment), the Grand Jury charged defendants Eugene Slay, Leroy Tyus, and James Cullen, together with Tom Zych, with violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343.[1] The indictment charged that, "by means of false and fraudulent pretenses, representations and the deceitful concealment of material facts," defendants Slay, Tyus, and Cullen, together with Zych, Paul Skulsky, and Sorkis Webbe, Sr.,
intended to devise a scheme and artifice to defraud:
The City of St. Louis and its citizens of their right to the conscientious, loyal, faithful, disinterested and unbiased services and actions in the performance of official duties of certain members of the Board of Aldermen of the City of St. Louis and their right to have those duties performed free from corruption, extortion, bribery, partiality, willful omission, *339 dishonesty, official misconduct, conflict of interest and fraud; and
The City of St. Louis, its officials and employees, including the Mayor, the City Counselor, the Board of Aldermen and the Comptroller, of their right to be aware of all material and relevant facts when analyzing and entering into contracts with entities seeking the award of a cable television franchise for the City of St. Louis, in particular Archway Cablevision; * * *
(Archway Indictment, No. 86-67CR(1), ¶ 11). The indictment further charged that, "by means of false and fraudulent pretenses, representations and the deceitful concealment of material facts," defendants "intended to devise a scheme and artifice to defraud * * * and to obtain money and property, specifically a cable television franchise from the City of St. Louis; ..." (Archway Indictment, ¶ 11). Thus, the indictment charged in the "conjunctive" that defendants intended to devise both an intangible rights scheme and a tangible property scheme.
After an eight-week jury trial, the Court instructed the jury that both mail and wire fraud consisted of two elements and that the first element of each could be established if the government proved either that "defendants wilfully, knowingly and intentionally intended to devise a scheme or artifice to defraud the City of St. Louis, its citizens, its officials and its employees, ..." or that "defendants wilfully and knowingly intended to devise a scheme to obtain property from the City of St. Louis by means of false or fraudulent pretenses, representations or promises or the deceitful concealment of material facts, ..." (Instructions Nos. 37 and 39). Thus, the instructions were in the "disjunctive." The instructions permitted the jury to find the first element of mail and wire fraud if it found either an intangible rights scheme or a tangible property scheme.
By Instructions Nos. 40 and 40-A, the Court instructed the jury of the circumstances in which it could find that defendants intended to devise a scheme to defraud St. Louis, its citizens, its officials and its employees. By Instruction No. 40-B, the Court instructed the jury of the circumstances in which it could find that defendants intended to devise a scheme to obtain money or other property by means of false representations and deceitful concealment.
By Instructions Nos. 37, 39, 40, and 40-A, the Court submitted the so-called "intangible rights"/"good government" theory to the jury. On June 2, 1987, the jury returned a verdict finding defendants Slay, Tyus, and Cullen guilty of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, as charged in the Archway indictment. The jury acquitted defendants Slay, Tyus, and Cullen on all charges in the related TCI/Melhar indictment. The jury acquitted Tom Zych on all charges in both the Archway indictment and the TCI/Melhar indictment.
On June 10, 1987, defendant Tyus obtained an extension of time in which to file, and on June 16, 1987, pursuant to Fed.R. Crim.P. 29(c) and 33, defendant Tyus filed a motion for judgment of acquittal after discharge of jury or in the alternative a motion for new trial. Subsequently, on June 24, 1987, the United States Supreme Court decided McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 1987), in which the court held that the mail fraud statute, 18 U.S.C. § 1341, does not protect the intangible right of the citizenry to good government. Thereafter, on the basis of McNally and contending that the jury's guilty verdicts must be set aside and that the Archway indictment must be dismissed, on July 6, 1987, defendant Tyus supplemented his earlier motion, and on July 15, 1987, defendants Slay, Tyus, and Cullen all moved pursuant to 28 U.S.C. § 2255, and pursuant to Fed.R.Crim.P. 12(b), and in the nature of a writ of error coram nobis, to set aside the jury's guilty verdicts and to dismiss the indictment. The Court postponed sentencing defendants in order to consider defendants' motions and the impact of McNally on the jury's guilty verdicts and on the indictment. The Court now concludes that the jury's guilty verdicts must be set aside, that the Archway indictment evaluated in light of McNally still charges an offense and therefore need *340 not be dismissed, and that defendants are entitled to a new trial on the charges in the Archway indictment.

I. Jurisdiction.
The United States contends that, notwithstanding the conceded relevance of McNally to the jury's guilty verdicts and to the Archway indictment, this Court lacks jurisdiction to consider defendants' challenge to the jury's guilty verdicts and to the indictment on the basis of McNally at this time. The United States contends that defendants must use the appellate process to challenge the jury's guilty verdicts. Specifically, the United States contends that defendant Tyus' motion pursuant to Rules 29(c) and 33 was not timely filed, that defendants Slay and Cullen did not file any motions pursuant to Rules 29(c) and 33, that a motion pursuant to 28 U.S.C. § 2255 does not lie because defendants are not in custody, and that a motion in the nature of a writ of error coram nobis does not lie because defendants can proceed by way of appeal. The United States does not specifically contend that motions pursuant to Fed.R.Crim.P. 12(b) are unavailable.
a. Defendant Tyus' motion pursuant to Rules 29(c) and 33 was timely filed. Rules 29(c) and 33 both provide that motions pursuant to these rules must be made within seven days after the jury verdict or within such further time as the court may fix during the seven-day period. Fed.R.Crim. P. 29(c) and 33. As Rules 29(c) and 33 allow less than 11 days to file motions, intermediate Saturdays, Sundays, and holidays are excluded from the computation of time. Fed.R.Crim.P. 45(a). As June 6 and 7, 1987, were a Saturday and a Sunday, the last day to file a Rule 29(c) or 33 motion, or to obtain further time to so file, was June 11, 1987. As defendant Tyus timely obtained further time to file a Rules 29(c) and 33 motion on June 10, 1987, and as his Rules 29(c) and 33 motion was filed within the further time so obtained, defendant Tyus' Rules 29(c) and 33 motion was timely filed. Therefore, the Court has jurisdiction to consider defendant Tyus' Rules 29(c) and 33 motion.
b. Defendants Slay and Cullen contend that they should obtain the benefit of defendant Tyus' timely filed motion pursuant to Rules 29(c) and 33. The Court agrees. During the pre-trial proceedings, the in-chambers conferences, the side-bar conferences, and the trial of this case, often as many as ten attorneys for the parties were present.[2] Therefore, throughout the proceedings in this case, the Court repeatedly advised the attorneys for the defendants that an objection or motion made on behalf of one defendant would be deemed to be made on behalf of the other defendants, unless the other defendants specifically declined to join in the objection or motion. Defendant Tyus timely filed a motion pursuant to Fed.R.Crim.P. 29(c) and 33. Defendants Slay and Cullen did not specifically decline to join in the motion. Accordingly, pursuant to the Court's repeated indication to the attorneys that the objection or motion made on behalf of one defendant would be deemed to be made on behalf of the other defendants, the Court deems defendant Tyus' timely filed motion pursuant to Rules 29(c) and 33 to have been timely made on behalf of defendants Tyus, Slay, and Cullen. Therefore, the Court has jurisdiction to consider defendants Slay and Cullen's Rules 29(c) and 33 motions.
c. The United States contends that defendants are not "in custody" and therefore cannot proceed pursuant to 28 U.S.C. § 2255. Defendants counter that they can proceed pursuant to 28 U.S.C. § 2255 because they are "in custody" for the purposes of that section in that they are free on bonds, have an obligation to appear in court when haled, have restrictions on their freedom of movement and travel, and could be confined if the Court revokes their bonds. Defendants cite Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984), Hensley *341 v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), and McCray v. Abrams, 750 F.2d 1113 (2nd Cir.1984), cert. granted and judgment vacated, ___ U.S. ___, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986) (remanding for further consideration in light of Allen v. Hardy, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), and Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)), in support of their position.
In Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), Hensley was convicted in state court and sentenced to a one-year sentence. At all times after his conviction, Hensley was free on his own recognizance. Hensley unsuccessfully appealed his conviction, exhausted his available state remedies, and then filed a petition for a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. 411 U.S. at 346-347, 93 S.Ct. at 1572-1573. The Supreme Court held that Hensleywho had been convicted and sentenced, but who was released on his own recognizance pending the execution of his sentencewas "in custody" for purposes of 28 U.S.C. § 2254. 411 U.S. at 351-353, 93 S.Ct. at 1574-1575. McCray v. Abrams, 750 F.2d 1113 (2nd Cir.1984), is similar. See 750 F.2d at 1114 n. 1. (McCraywho was convicted and sentenced, but who was free on bond pending the execution of his sentencewas "in custody" for purposes of 28 U.S.C. § 2254). In Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984), Lydon was convicted at a bench trial in state court and sentenced to a term of imprisonment. Pursuant to Massachusetts law, Lydon then requested a trial de novo before a jury, which request was granted. Pending retrial, he was released on his own recognizance. Thereafter, Lydon moved to dismiss the charge against him on the ground that the evidence presented at the first trial was legally insufficient and that a second trial was barred by double jeopardy. Lydon's motion to dismiss was denied and he appealed. The state courts rejected Lydon's double jeopardy claim, thereby exhausting Lydon's available state remedies. Lydon then filed a petition for a federal writ of habeas corpus pursuant to 28 U.S. C. § 2254. 466 U.S. at 297-299, 104 S.Ct. at 1807-1808. The Supreme Court held that Lydonwho was released on his own recognizance pending the second trial and resentencing if reconvictedwas "in custody" for purposes of 28 U.S.C. § 2254 with respect to his double jeopardy claim.
Upon review of these cases, the Court concludes that they do not support defendants' position that defendants can proceed pursuant to 28 U.S.C. § 2255. In Hensley and McCray, the petitioners were free pending the execution of their sentences. If habeas relief were denied, the petitioners would be imprisoned in possible violation of their constitutional rights. Similarly, in Lydon, the petitioner was free pending retrial and resentencing if reconvicted. If habeas relief were denied, the petitioner would be retried and resentenced in possible violation of double jeopardy. In these circumstances, the courts found that the petitioners were "in custody" for purposes of 28 U.S.C. § 2254. In contrast, defendants Slay, Tyus, and Cullen have not been sentenced. They are not presently free pending execution of sentences. In fact, defendants have not even appealed their convictions yet. If the Court denies § 2255 relief, defendants may still appeal their convictions. The Court notes that defendants are in the same position as all federal defendants who are free on bond awaiting sentencing on their convictions. Lydon, Hensley, and McCray do not stand for the proposition that all such federal defendants may utilize § 2255 to prevent their sentencing.
Moreover, the Court does not believe that 28 U.S.C. § 2255, by its own terms, even applies to defendants who have not yet been sentenced. Section 2255 provides in pertinent part:
A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose *342 such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (emphasis added). By its terms, § 2255 permits persons under sentence of a federal court to move to vacate, set aside or correct the sentence. As defendants Slay, Tyus, and Cullen have not been sentenced, they are not within the group of persons authorized to file § 2255 motions. Further, they have no sentences to vacate, set aside or correct.
For the foregoing reasons, the Court concludes that defendants cannot proceed pursuant to 28 U.S.C. § 2255.
d. Defendants Slay, Tyus, and Cullen have also filed their challenge to their convictions and to the indictment pursuant to Fed.R.Crim.P. 12(b). Rule 12(b)(2) provides:
(b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
* * * * * *
(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); * * *
Fed.R.Crim.P. 12(b)(2).
Professor Wright describes the effect of Rule 12(b)(2) as follows:
Any defense, objection, or request that is capable of determination without the trial of the general issue may be raised before trial by motion. * * *
[With respect to the defenses of] lack of jurisdiction in the court or the failure of the indictment or information to charge an offense, ... [t]hese defects "shall be noticed by the court at any time during the pendency of the proceedings." Though there is an occasional statement that these defects must be asserted within the time allowed by the court for motions or before jeopardy attaches, the plain language of the rule and the overwhelming weight of authority is to the contrary. Although lack of jurisdiction or failure of the indictment or information to state an offense are defenses that may be raised by an ordinary pretrial motion to dismiss, the motion need not be made within a reasonable time after arraignment and it need not be combined with other earlier pretrial motions. The objection is timely though first raised in a motion for new trial, a motion for arrest of judgment, on appeal, or by collateral attack.
There is an inconsistency in this respect between Rule 34, on arrest of judgment, and Rule 12(b)(2). The same objections here discussed, lack of jurisdiction and failure of the indictment or information to charge an offense, are the stated grounds on which Rule 34 permits a motion for arrest of judgment. Yet that rule permits such a motion to be made only within seven days after verdict, or such extended time as the court may fix within the seven day period, while Rule 12(b)(2) makes it mandatory that the court notice precisely the same defect at any time during the pendency of the proceeding. The Supreme Court has observed this inconsistency but did not have to resolve it. The lower courts have considered that Rule 12, rather than the restricted time limit of Rule 34, is controlling.
1 C. Wright, Federal Practice and Procedure § 193 at 692-695 (1982) (footnotes omitted) (emphasis added).[3]See United *343 States v. Clark, 646 F.2d 1259, 1262 (8th Cir.1981); see also United States v. Watkins, 709 F.2d 475, 478 n. 2 (7th Cir.1983); United States v. Pheaster, 544 F.2d 353, 361 (9th Cir.1976), cert. denied, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); United States v. Macklin, 523 F.2d 193, 195 (2nd Cir.1975); United States v. Wedgewood, Inc., 457 F.2d 648, 650 (1st Cir.), cert. denied, 409 U.S. 846, 93 S.Ct. 51, 34 L.Ed.2d 87 (1972).
Rule 12(b)(2) provides that the defense that the indictment fails to charge an offense may be raised at any time during the pendency of the proceedings. Therefore, the Court concludes that it has jurisdiction to consider defendants Slay, Tyus, and Cullen's motions pursuant to Fed.R.Crim.P. 12(b)(2) to the extent the motions contend that the jury's guilty verdicts must be set aside and that the indictment must be dismissed because the indictment fails to charge an offense. United States v. Clark, 646 F.2d 1259, 1262 (8th Cir.1981).
With respect to Rule 12(b)(2) defenses and objections based on defects in the indictment other than that the indictment fails to show jurisdiction in the Court or fails to charge an offense, these defenses and objections must be raised prior to trial. Fed.R.Crim.P. 12(b)(2). The failure to raise such defenses or objections constitutes waiver thereof. Fed.R.Crim.P. 12(f). However, the Court for cause shown may grant relief from the waiver. Id. See United States v. Goodwin, 457 U.S. 368, 371 n. 3, 102 S.Ct. 2485, 2488 n. 3, 73 L.Ed.2d 74 (1982); United States v. Randolph, 738 F.2d 244, 246 (8th Cir.1984); United States v. Johnson, 614 F.2d 622, 623 (8th Cir.1980); see also 1 C. Wright, Federal Practice and Procedure § 193 at 697-698 (1982).
In the instant case, defendants timely filed pretrial motions to dismiss the indictment. At that time, the United States' "intangible rights"/"good government" theory was well-established in this circuit, as well as in other circuits. See cases cited at McNally v. United States, ___ U.S. ___, ___ n. 1, 107 S.Ct. 2875, 2883 n. 1, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting). Defendants thus did not specifically challenge the United States' "intangible rights"/"good government" theory in their motions to dismiss. This Court denied defendants' motions to dismiss. United States v. Tyus, No. 86-67CR(1) (E.D.Mo. April 3, 1987). Subsequently, the case went to trial, the Court submitted the case to the jury on, inter alia, the United States' "intangible rights"/"good government" theory, and the jury rendered guilty verdicts against defendants. However, before the Court could sentence defendants, the United States Supreme Court rendered its decision in McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), invalidating the United States' "intangible rights"/"good government" theory. Promptly thereafter, defendants filed their instant Rule 12(b) motions to dismiss the indictment. The Court deems defendants' present Rule 12(b) motions to be renewals of defendants' prior Rule 12(b) motions to dismiss the indictment, though the present motions raise a new ground.
The McNally decision was a total surprise because it overruled well-established precedent in this circuit and other circuits which recognized the United States' "intangible rights"/"good government" theory. Because the United States' theory was so well-recognized, defendants, prior to the McNally decision, had no reason to challenge the theory. Under these circumstances, the Court concludes that defendants have shown good cause for their failure to challenge the United States' "intangible rights"/"good government" theory prior to trial. Accordingly, the Court grants defendants relief from any waiver of defenses and objections based on defects in the Archway indictment which may have occurred by operation of Rules 12(b)(2) and 12(f). See Fed.R.Crim.P. 12(f). Therefore, the Court concludes that it has jurisdiction to consider defendants Slay, Tyus, and Cullen's renewed motions to dismiss pursuant to Fed.R.Crim.P. 12(b) to the extent the motions contend that the jury's guilty verdicts must be set aside and that the indictment *344 must be dismissed because the indictment contains a defect. See Fed.R.Crim.P. 12(b)(2).
e. Defendants Slay, Tyus, and Cullen also challenge the jury's guilty verdicts by motions in the nature of a writ of error coram nobis. The United States concedes that, in certain circumstances, a defendant may proceed in federal district court by a motion in the nature of the extraordinary common law writ of error coram nobis, see United States v. Morgan, 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248 (1954), and that federal district courts have the power to issue the writ pursuant to the All Writs Act statute, 28 U.S.C. § 1651. However, the United States contends that, as defendants Slay, Tyus, and Cullen may still challenge the jury's guilty verdicts by direct appeal, they may not proceed by way of coram nobis.
In United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), Morgan served his federal sentence. He then wanted to set aside his conviction and sentence in order to avoid the collateral consequences associated with being a convicted felon. 346 U.S. at 503-504. As he was no longer "in custody," he could not proceed pursuant to 28 U.S.C. § 2255 to set aside his conviction and sentence. Morgan therefore filed an application for a writ of error coram nobis with the federal district court where his sentence was imposed. Id. at 504, 74 S.Ct. at 248. In this circumstance, the Supreme Court held that: "no other remedy being then available and sound reasons existing for failure to seek appropriate relief earlier, this motion in the nature of the extraordinary writ of coram nobis must be heard by the federal trial court." Id. at 512, 74 S.Ct. at 253.
"The writ of error coram nobis is an extraordinary remedy designed to correct errors of a fundamental nature." Willis v. United States, 654 F.2d 23, 24 (8th Cir. 1981). See United States v. Morgan, 346 U.S. at 512, 74 S.Ct. at 253; Gajewski v. United States, 368 F.2d 533, 534 (8th Cir. 1966), cert. denied, 386 U.S. 913, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967). "[E]rror coram nobis relief should not be granted except under compelling circumstances." Gajewski, 368 F.2d at 534. See Deckard v. United States, 381 F.2d 77 (8th Cir.1967). Further, "Writ of Error Coram Nobis ... will not lie where there is another adequate remedy, ..." Lipscomb v. United States, 273 F.2d 860, 865 (8th Cir.), cert. denied, 364 U.S. 836, 81 S.Ct. 72, 5 L.Ed.2d 61 (1960). Accord Lee v. United States, 501 F.2d 494, 501 (8th Cir.1974). See generally, United States v. Little, 608 F.2d 296, 299 n. 5 (8th Cir.1979), cert. denied, 444 U.S. 1089, 100 S.Ct. 1053, 62 L.Ed.2d 777 (1980), (listing the three circumstances where error coram nobis relief has been found to lie).
In the instant case, the Court has concluded that defendants have available to them their adequate remedies of their timely filed Rules 29(c) and 33 motions and their post-trial trial Rule 12(b)(2) motions. Thus, the Court concludes that error coram nobis relief does not lie. However, to the extent Rules 12(b)(2), 29(c), and 33 are unavailable to these defendants, the Court concludes that error coram nobis relief does lie. If the Court does not grant defendants relief under the Federal Rules of Criminal Procedure, then the Court would be forced to sentence defendants, and possibly incarcerate them, even though the Court believes that the jury's guilty verdicts are infirm. In this circumstance, the Court believes that the availability of appeal is not an adequate remedy and that error coram nobis relief would lie. Therefore, to the extent the Court does not have jurisdiction under the Federal Rules of Criminal Procedure to set aside the jury's guilty verdicts and to dismiss the indictment, the Court proceeds by way of error coram nobis.

2. McNally.
In McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the United States prosecuted Gray, a former public official of the Commonwealth of Kentucky, and McNally, a private individual, for, inter alia, violation of the federal mail fraud statute, 18 U.S.C. § 1341. With respect to the mail fraud *345 violation, the indictment charged that Gray and McNally "devised a scheme (1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and (2) to obtain, directly and indirectly, money and other things of value by means of false pretenses and the concealment of material facts." ___ U.S. at ___, 107 S.Ct. at 2878. The district court submitted the mail fraud violation to the jury,[4] which rendered guilty verdicts against Gray and McNally. The Court of Appeals affirmed. Id. at ___, 107 S.Ct. at 2879. Contending that they had been impermissibly convicted for defrauding citizens of their intangible right to good government, Gray and McNally sought review in the Supreme Court.
Upon review, the United States Supreme Court concluded that the McNally instructions permitted the jury to convict Gray and McNally without finding that they had obtained money by means of false pretenses and the concealment of material facts. Id. at ___ _ ___, 107 S.Ct. at 2881-2882.[5] Rather, the Supreme Court concluded *346 that the McNally instructions permitted the jury to convict Gray and McNally if the jury found that Gray and McNally had engaged in a scheme to defraud the citizens of their intangible right to good government. Id. at ___, 107 S.Ct. at 2878. Thus, the Supreme Court was faced with the issue of whether the federal mail fraud statute, 18 U.S.C. § 1341, criminalizes schemes to defraud citizens of their intangible right to good government. Id. at ___, 107 S.Ct. at 2881.
In a surprising decision, the Supreme Court rejected the "line of decisions from the Courts of Appeals holding that the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government," id. at ___, 107 S.Ct. at 2879, and concluded that the mail fraud statute is "limited in scope to the protection of property rights." Id. at ___, 107 S.Ct. at 2881. Thus, the mail fraud statute does not criminalize schemes to defraud citizens of their intangible right to good government.
As the McNally "jury was not required to find that the Commonwealth itself was defrauded of any money or property" and was not required "to find that the Commonwealth was deprived of control of how its money was spent," the Supreme Court concluded "that the jury instruction on the substantive mail fraud count permitted a conviction for" a scheme to defraud citizens of their intangible rights, "conduct not within the reach of § 1341." Id. at ___ _ ___, 107 S.Ct. at 2882. Therefore, the Supreme Court held that Gray and McNally's convictions could not stand. Id. at ___, 107 S.Ct. at 2882.
The import of McNally as it relates to the instant case is that the Supreme Court invalidated the "intangible rights"/"good government" theory of mail fraud prosecutions under 18 U.S.C. § 1341. Further, as the substantive portion of the wire fraud statute, 18 U.S.C. § 1343, is identical to the substantive portion of the mail fraud statute, 18 U.S.C. § 1341, construed in McNally, McNally also invalidates the "intangible rights"/"good government" theory of wire fraud prosecutions under 18 U.S.C. § 1343. See United States v. Gimbel, 830 F.2d 621, 627 (7th Cir.1987) (concluding that, on the basis of McNally, the wire fraud statute is limited to the protection of property rights).

3. The Jury Verdict.
By Instructions Nos. 37, 39, 40, and 40-A, the Court submitted the "intangible rights"/"good government" theory to the jury. These instructions permitted the jury to convict defendants of violating the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, without requiring that the jury find that defendants obtained or intended to obtain money or other property by means of false pretenses and the concealment of material facts. Therefore, although perfectly correct under the law at the time given, these instructions "permitted a conviction for conduct not within the reach of § 1341" and § 1343, McNally, ___ U.S. at ___, 107 S.Ct. at 2882, according to the surprising decision in McNally.
The United States argues that Instruction No. 40-B did require that the jury find that defendants' "`false pretenses' scheme was designed to defraud the city of [money or property] in order to convict," and thus that defendants' convictions can be upheld. (United States' Response to Defendants' Post-Trial Motions at 4). Instruction No. 40-B set forth the circumstances in which the jury could find a scheme to obtain money or other property by means of false and fraudulent pretenses. However, Instructions Nos. 37 and 39 set forth the two elements of mail and wire fraud violations. In these instructions the first of the two elements was in the disjunctive and permitted the jury to convict defendants of mail and wire fraud violations if the jury found either that defendants intended to devise a scheme to defraud St. Louis of its intangible right to good government or that defendants intended to devise a scheme to obtain property from St. Louis by means of false and fraudulent pretenses. Thus, the *347 instructions when read as a whole did not require that the jury find a scheme to obtain property, and Instruction No. 40-B did not operate to require the jury to find such a scheme, in order to convict defendants. Instruction No. 40-B did not cure the flaw in Instructions Nos. 37 and 39.
Defendants' convictions present the situation where the jury was presented with two independent grounds upon which it could convict defendants, with one of the two grounds being a sufficient ground (Instruction No. 40-B), but with the other ground being an insufficient ground (Instructions Nos. 40 and 40-A). The jury rendered a general verdict, not specifying upon which of the two possible grounds it rested. In this circumstance, the jury's verdict may have rested exclusively on the insufficient ground and therefore must be set aside unless the Court is certain "as to the actual ground on which the jury's decision rested." Zant v. Stephens, 462 U.S. 862, 880-881, 103 S.Ct. 2733, 2744-2745, 77 L.Ed.2d 235 (1983); Yates v. United States, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957); Stromberg v. California, 283 U.S. 359, 367-368, 370, 51 S.Ct. 532, 535, 536, 75 L.Ed. 1117 (1931).
In Tanner v. United States, ___ U.S. ___, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), Tanner and Conover were convicted of, inter alia, conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The United States charged that Tanner and Conover had conspired to defraud Seminole Electric Cooperative, Inc.; that Seminole received financial assistance and supervision from the United States; and thus that the "conspiracy to defraud Seminole was itself a conspiracy `to defraud the United States'," within the meaning of § 371. ___ U.S. at ___, 107 S.Ct. at 2752 (emphasis in original). The Supreme Court rejected the United States' argument and concluded that a conspiracy to defraud Seminole was not necessarily a conspiracy to defraud the United States. Id. at ___, 107 S.Ct. at 2752. However, the indictment against Tanner and Conover also charged that Tanner and Conover conspired to cause Seminole to make false statements and representations to the United States. Id. This did charge a conspiracy to defraud the United States within the meaning of § 371. The Court therefore concluded that: "If the evidence presented at trial was sufficient to establish that [Tanner and Conover] conspired to cause Seminole to make misrepresentations to the [United States], then [Tanner and Conover's] convictions may stand." Id. The Court remanded the case to the Court of Appeals to pass on the sufficiency of the evidence on that particular charge. Id. The Court did not state what the lower court's standard of sufficiency should be.
In Rose v. Clark, ___ U.S. ___, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the Supreme Court held that an otherwise valid conviction should not be set aside for an erroneous malice instruction if the error was harmless under the Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), standard. 106 S.Ct. at 3109. Under Chapman, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). Likewise, in Pope v. Illinois, ___ U.S. ___, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), the Supreme Court held that Pope's conviction could stand despite an unconstitutional obscenity definition instruction if on remand the Illinois Court of Appeals determined under the Chapman standard that "`the record developed at trial established guilt beyond a reasonable doubt'." ___ U.S. ___, 107 S.Ct. at 1922 (quoting Rose v. Clark, ___ U.S. ___, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).
The error in the instructions in this case in permitting the jury to convict defendants for conduct not criminalized by and not within the reach of the mail and wire fraud statutes, see McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), is a fundamental error. As such, the Court concludes that the standard by which the Court must assess whether the Court is certain that the jury *348 rested its decision on conduct that is criminalized by and is within the reach of the mail and wire fraud statutes is the Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), standard. See Pope v. Illinois, ___ U.S. ___, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987); Rose v. Clark, ___ U.S. ___, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); Zant v. Stephens, 462 U.S. 862, 881, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983).
The United States argues that the acquittal of Tom Zych, the President of the Board of Aldermen, on all charges in both the TCI/Melhar indictment and the Archway indictment demonstrates that the jury rejected the "good government"/"intangible rights" theory and convicted defendants for intending to devise a scheme to obtain money or other property from St. Louis by means of false representations as set forth in Instruction No. 40-Bconduct criminalized by and within the reach of the mail and wire fraud statutes.
Upon review of the evidence presented in this case, the Court concludes that the acquittal of Tom Zych does not establish beyond a reasonable doubt that the jury convicted defendants for conduct within the reach of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. The Court is far from certain that the jury rested its actual decision on a finding that defendants intended to devise a scheme to obtain money or other property from St. Louis by means of false representations. First, the jury could have rationally concluded that the evidence was sufficient to find Slay, Tyus, and Cullen guilty beyond a reasonable doubt of intending to devise a scheme to defraud St. Louis of its intangible right to good government, but that the same evidence was insufficient to find Zych guilty thereof beyond a reasonable doubt. Second, in the trial of this case the United States argued and presented evidence that other Aldermen, including Robert Ruggeri and Lerel Stewart, were also involved in the alleged scheme to defraud St. Louis of its intangible right to good government. The jury could have rationally concluded that other Aldermen, but not Zych, were involved in defendants' scheme. Third, the jury could have rationally concluded that defendants Slay, Tyus, and Cullen entered into such a scheme, but that they did not succeed in getting any Aldermen to join their scheme. Thus, the jury could have rationally convicted defendants Slay, Tyus, and Cullen on the "good government"/"intangible rights" theory, notwithstanding their belief that Zych was not involved in defendants' scheme to defraud St. Louis of its intangible right to good government.
A rational juror could come to any of the above conclusions because a rational juror could have chosen to accept the tape recorded co-conspirator hearsay statements of Webbe, Sr., and Webbe, Jr., (evidencing a scheme to defraud St. Louis of its intangible right to good government) as probative evidence against defendants Slay, Tyus, and Cullen, while simultaneously finding that this evidence was not probative against Zych. Such a distinction would have been rational due to Zych's absence from many of the meetings at which the more incriminating tape recorded statements were made. Likewise, a rational juror could have concluded that Zych's tape recorded statements did not show Zych's knowing and intentional involvement in the alleged scheme to defraud St. Louis of its intangible right to good government, but that Slay, Tyus, and Cullen's tape recorded statements did show their knowing and intentional involvement in the alleged scheme.
In sum, the "good government"/"intangible rights" theory was supportable with or without Zych's participation. Thus, the acquittal of Zych provides no indication that the jury chose the defrauding of property theory and rejected the "good government"/"intangible rights" theory. The United States has not otherwise convinced the Court that the jury chose the permissible theory or that defendants Slay, Tyus, and Cullen are guilty beyond a reasonable doubt of intending to devise a scheme to obtain money or property from St. Louis by false representations. Therefore, the jury's "verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *349 Yates v. United States, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957). Thus, the jury verdicts of guilty rendered against defendants Slay, Tyus, and Cullen must be set aside. Zant v. Stephens, 462 U.S. 862, 881, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). Accordingly, pursuant to Federal Rules of Criminal Procedure 12(b)(2) and 29(c), and pursuant to proceedings in the nature of motions for a writ of error coram nobis, the jury verdicts of guilty rendered against defendants Slay, Tyus, and Cullen are set aside.

4. Dismissal of the Archway Indictment.
Defendants, citing Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), argue that the Archway indictment must now be dismissed. Defendants' argument is as follows: McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), invalidated the United States' "good government"/"intangible rights" theory; those portions of the indictment relating to the charged scheme to defraud St. Louis of its intangible right to good government therefore do not relate to the charging of a criminal offense; as such these portions of the indictment are useless averments or surplusage, and must be stricken;[6] striking these portions of the indictment as surplusage would be striking allegations "which may have been the basis for one or more of the grand jurors to vote to indict," (Defendants' Joint Reply Memorandum in Support of Their Motion to Vacate the Judgment and Dismiss the Indictment at 14); striking surplusage would thus deny defendants of their right to be tried only on a grand jury's indictment; and therefore the Archway indictment must be dismissed. In other words, the indictment contains surplusage which must be stricken, but the Court cannot strike the surplusage consistent with the Fifth Amendment, and therefore the indictment must be dismissed.
The United States, citing United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), counters that, so long as the allegations in the indictment remaining after the Court strikes surplusage still charge an offense, the indictment must stand.
In Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), the grand jury indictment charged that Bain filed certain false reports with intent to deceive both the Comptroller of the Currency and the bank examiner. 121 U.S. at 4, 7 S.Ct. 783. Under the relevant criminal statute, an intent to deceive the bank examiner was all that was required. The allegation of intent to deceive the Comptroller was surplusage. The trial court permitted the government to amend the indictment by striking out the reference to the Comptroller. Id. at 5, 7 S.Ct. at 783. Bain was tried and convicted under the so-amended indictment. As explained in United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court in Bain granted Bain "a writ of habeas corpus on the ground that Bain's Fifth Amendment right to stand trial only on an indictment returned by a grand jury had been violated. The opinion reasoned that a court could not, consistent with the Fifth Amendment, assume that the narrower indictment would have been returned by the grand jury that returned the broader one." 471 U.S. at 141, 105 S.Ct. at 1818. In the Bain court's view, "the deletion from an indictment of allegations that would not have been necessary to prove the offense ... constitute[d] a compromise of the defendant's right to be tried only on a grand jury indictment" and thus resulted in "an unconstitutional `amendment'" to the indictment. 471 U.S. at 140, 105 S.Ct. at 1817.
In United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), "the indictment [] charged Miller with various fraudulent acts in connection with the burglary at his place of business. Miller allegedly had defrauded his insurer both by *350 consenting to the burglary in advance and by lying to the insurer about the loss of value. The trial proof, however, concerned only" the allegation that Miller had grossly inflated the value of any loss. 471 U.S. at 131-133, 105 S.Ct. at 1813-1814. The jury convicted Miller. On appeal, the Ninth Circuit Court of Appeal, relying on Ex parte Bain and its progeny and reasoning that "[t]he grand jury may well have declined to indict Miller simply on the basis of his exaggeration of the amount of his claimed loss," 715 F.2d 1360 at 1362, vacated Miller's conviction on the ground that "Miller's Fifth Amendment right to be tried only on a grand jury indictment had been violated." 471 U.S. at 134, 105 S.Ct. at 1814.
The Supreme Court reversed. United States v. Miller, 471 U.S. 130, 131, 105 S.Ct. 1811, 1813, 85 L.Ed.2d 99 (1985). In discussing Ex parte Bain, the Court stated:

Bain can support the proposition that the striking out of parts of an indictment invalidates the whole of the indictment, for a court cannot speculate as to whether the grand jury had meant for any remaining offense to stand independently, even if that remaining offense clearly was included in the original text. Under this ... proposition, the narrowing of an indictment is no different from the adding of a new allegation that had never been considered by the grand jury; both are treated as "amendments" that alter the nature of the offense charged.
471 U.S. at 142, 105 S.Ct. at 1818. The court then noted that:
when defendants have sought to rely on Bain for this point, this Court has limited or distinguished the case, sustaining convictions where courts had withdrawn or ignored independent and unnecessary allegations in the indictments.... To the extent Bain stands for the proposition that it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it, that case has simply not survived. To avoid further confusion, we now explicitly reject that proposition.
471 U.S. at 144, 105 S.Ct. at 1819.[7] Thus, the Supreme Court concluded that the Fifth Amendment grand jury guarantee is not violated "when a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme." 471 U.S. at 131, 105 S.Ct. at 1813.
In United States v. Miller, the government's failure to prove that Miller had defrauded his insurer by consenting to the burglary in advance "was in no way essential to the offense on which the jury convicted," 471 U.S. at 145, 105 S.Ct. at 1820, namely that Miller had defrauded his insurer by lying to the insurer about the loss of value. Therefore, the court held that Miller's "right to be tried only on offenses for which a grand jury has returned an indictment" was not violated. Id.
In United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the "surplusage" appears to have in fact related to the charging of an offense. In contrast, in the instant case, by virtue of McNally v. United States, ___ U.S. ___, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the "surplusage" is not related to the charging of an offense. Yet, the "surplusage" in Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), also was not related to the charging of an offense. Thus, under United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), which rejected Ex parte Bain, surplusage is surplusage. Therefore, the rule of United States v. *351 Miller also applies to surplusage which is not related to the charging of an offense.
Therefore, "[w]hile the Grand Jury Clause does guarantee that a criminal defendant is not convicted for an offense not charged in the indictment, it is not an unconstitutional amendment `to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it'." United States v. Nabors, 762 F.2d 642, 648 n. 11 (8th Cir.1985) (quoting United States v. Miller, 471 U.S. 130, 144, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985)). Thus, in the instant case, the United States correctly argues that, under United States v. Miller, so long as the allegations in the indictment remaining after the Court strikes the surplusage still charge an offense, prosecuting defendants on the so-edited indictment will not violate defendants' "right to be tried only on offenses for which a grand jury has returned an indictment." 471 U.S. at 145, 105 S.Ct. at 1820. Therefore, the indictment will not be dismissed on Fifth Amendment grand jury guarantee grounds. Rather, the Court will evaluate the indictment after striking surplusage to determine if it still charges an offense.
In evaluating the indictment to determine if it still charges an offense, the Court will strike paragraphs 6, 7, 8, 9, 10, the first two-thirds of the introductory portion of paragraph 11, and subparagraphs 11(f), 11(g), and 11(o). See supra footnote 6. Further, the Court will read all references to Tom Zych in the indictment in light of the fact that the jury acquitted Tom Zych on all chargesthus rejecting both the tangible property theory and the "intangible rights"/"good government" theory as they related to Zych. This affects paragraphs 6, the introduction to paragraph 11, and subparagraphs 11(f), 11(h), 11(i), 11(j), 11(l), 11(m), 11(n), and 11(o).
Upon evaluating the indictment as set forth above, the Court concludes that the indictment still charges an offense and therefore need not be dismissed. The indictment still charges that defendants Slay, Tyus, and Cullen intended to devise a scheme to obtain tangible property (the St. Louis Cable Television Franchise) from the City of St. Louis by means of false and fraudulent pretenses, representations and the deceitful concealment of material facts directed to the City of St. Louis. The indictment, after striking surplusage and reading the references to Tom Zych in light of the jury's verdict, still contains numerous specific factual allegations concerning defendants Slay, Tyus, and Cullen which indicate fraudulent representations and deceitful concealments by these defendants to the City of St. Louis intended to obtain tangible property from the City of St. Louis. Therefore, the indictment still charges a violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, as interpreted by McNally. Accordingly, defendants' motions to dismiss the indictment for failure to charge an offense are denied.

5. New Trial.
The jury verdicts of guilty must be set aside due to the fundamental instructional error in this case. However, the indictment still charges an offense after evaluation in light of McNally and need not be dismissed. Therefore, defendants are entitled to a new trial on the charges in the Archway indictment. Accordingly, pursuant to Federal Rule of Criminal Procedure 33 and pursuant to proceedings in the nature of motions for a writ of error coram nobis, defendants Slay, Tyus, and Cullen are hereby granted a new trial.

6. 18 U.S.C. § 3731.
The Court directs the United States' attention to a 1984 amendment to 18 U.S.C. § 3731 which permits the United States to appeal this Court's order granting a new trial. See 18 U.S.C. § 3731, as amended by P.L. 98-473, § 1206; United States v. Shaffer, 789 F.2d 682, 686-687 (9th Cir.1986); United States v. Dunn, 779 F.2d 157, 158 (2nd Cir.1985); United States v. Draper, 762 F.2d 81, 82 (10th Cir.1985). The Court believes that the interests of justice would be served if the United States pursued an immediate appeal from this *352 Court's order granting defendants a new trial. The Court suggests that the United States utilize 18 U.S.C. § 3731. Furthermore, in light of certain serious doubts which this Court entertains regarding the indictment after McNally (as set forth below), the Court suggests that defendants attempt to pursue a cross-appeal of this Court's decision not to dismiss the indictment.
In this connection, a brief review of the history of this case will be helpful. In fact, at the beginning, there were two cases: United States v. Sorkis Webbe, Sr., Sorkis Webbe, Jr., Leroy Tyus, Tom Zych, Eugene Slay, and Tom Cullen, No. S1-84-207CR(1) (E.D.Mo.), and United States v. Tom Zych, Eugene Slay, Leroy Tyus, and James Cullen, No. 86-67CR(1) (E.D.Mo.). The circumstances leading up to the two cases are, in brief, as follows: Between July 1982 and January 1984, certain St. Louis business persons, City officials, and cable television franchisors had numerous conversations and negotiations regarding the granting by the City of St. Louis of a cable television franchise for the City of St. Louis. On October 15, 1982, the Federal Bureau of Investigation obtained a court order authorizing the installation of electronic listening devices in the Mayfair Hotel offices of businessman and political powerbroker Sorkis Webbe, Sr. By these listening devices, the FBI recorded conversations wherein Webbe, Sr., Webbe, Jr., Slay, Tyus, Cullen, and others discussed strategies for obtaining the potentially lucrative St. Louis cable television franchise for corporations in which they would have varying ownership interests. St. Louis Board of Aldermen President Tom Zych's name was mentioned at many meetings in Webbe, Sr.'s office. According to the evidence, Zych (who was the only public official deeply involved in these cable negotiations) met with Webbe, Sr., and other principals during this time.
On November 8, 1984, the grand jury indicted Webbe, Sr., Webbe, Jr., Tyus, Zych, Slay, and Cullen in No. S1-84-207CR(1), the TCI/Melhar indictment, for numerous federal crimes arising out of their attempt to obtain the St. Louis cable television franchise. Clearly, the major defendant was Webbe, Sr., and his ties with Zych (and, of course, other defendants) formed the cornerstone of the case.
On May 29, 1985, Sorkis Webbe, Sr., died. Thereafter, on December 18, 1985, his son Sorkis Webbe, Jr., pled guilty to all the charges against him in the TCI/Melhar indictment. Shortly thereafter, on March 7, 1986, a new grand jury indicted Zych, Slay, Tyus, and Cullen in No. 86-67CR(1), the Archway indictment, for mail and wire fraud violations. Foremost among the theories in the Archway indictment was the grand jury's charge that Zych, Slay, Tyus, and Cullen together with Webbe, Sr., and Paul Skulsky, devised a scheme to defraud St. Louis of its intangible right to good government. As with the TCI/Melhar indictment, Zych as President of the Board of Aldermen was a key factor in the case.
On April 14, 1987, the two cases proceeded to trial together against Zych, Slay, Tyus, and Cullen. On June 2, 1987, the jury rendered its verdict acquitting all defendants on all charges in the TCI/Melhar indictment, No. S1-84-207CR(1), acquitting Zych on all charges in the Archway indictment, No. 86-67CR(1), but finding Slay, Tyus, and Cullen guilty of mail and wire fraud violations as charged in the Archway indictment, No. 86-67CR(1).
After the trial but before the sentencing of Slay, Tyus, and Cullen could occur, the McNally decision came down and significantly limited the scope of this case.[8] The caseonce a scheme charging extortion and corrupting St. Louis City government and involving a link between Webbe, Sr., and Zychis now narrowed to a case *353 charging Slay, Tyus, and Cullen with attempting to obtain a cable television franchise from the City of St. Louis by means of false representations directed to the City of St. Louis. The case no longer contains its main target Webbe, Sr., or its allegedly dishonest public official Zych. The Court believes that, without the prior TCI/Melhar indictment, without the "intangible rights"/"good government" theory, without the presence of Webbe, Sr., Webbe, Jr., and Zych, the case is a mere shadow of what it once was.
It is in this much limited posture that the case would proceed on retrial. It requires no legal brilliance to anticipate unique evidentiary questions:
1. certain evidence offered with respect to Zych will have to be viewed in light of his acquittal herein;
2. the transactions and events underlying the TCI/Melhar indictment may or may not be admissible at the new trial, even as other crimes or similar acts evidence, because the jury herein determined that those transactions and events did not amount to crimes;
3. evidence relating to the alleged scheme to defraud St. Louis of its intangible right to good government will likely be irrelevant and inadmissible.
Although this Court cannot dismiss the indictment, it will concede that the new trial against these three defendants will be very different from the original trial. The jury verdict herein and the totally surprising McNally decision require this. Perhaps the Eighth Circuit Court of Appeals will interpret McNally and Miller differently under the unique circumstances of this case. At least, this Court urges the parties to seek that direction through appeal and cross-appeal before we proceed to a re-trial.

ORDER
Pursuant to the memorandum filed herein this day,
IT IS HEREBY ORDERED that defendants Slay, Tyus, and Cullen's motions pursuant to Fed.R.Crim.P. 12(b), 29(c), and 33, pursuant to 28 U.S.C. § 2255, and pursuant to a proceeding in the nature of a motion for a writ of error coram nobis be and are granted in part and denied in part.
IT IS FURTHER ORDERED that the jury's verdicts of guilty rendered against defendants Slay, Tyus, and Cullen be and hereby are set aside.
IT IS FURTHER ORDERED that defendants Slay, Tyus, and Cullen's motions to dismiss the indictment be and hereby are denied.
IT IS FURTHER ORDERED that defendants Slay, Tyus, and Cullen be and hereby are granted a new trial.
NOTES
[1] By way of a related indictment (the "TCI/Melhar" indictment, No. S1-84-207CR(1)), the grand jury charged defendants, along with others, with various federal crimes.
[2] Defendant Slay was represented by two attorneys, defendant Cullen was represented by one attorney, defendant Tyus was represented by one and sometimes two attorneys, defendant Zych was represented by two attorneys, and the United States was represented by three attorneys.
[3] Professor Wright also notes that courts "have allowed untimely [Rule 34] motions by virtue of the provision of Rule 12(b)(2) that `lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding'." 3 C. Wright, Federal Practice and Procedure § 573 at 376 (1982). Cf. Lott v. United States, 367 U.S. 421, 427, 81 S.Ct. 1563, 1567, 6 L.Ed.2d 940 (1961) (expressly declining to decide whether an untimely Rule 34 motion should be treated as a Rule 12(b)(2) motion).
[4] "After informing the jury of the charges in the indictment, the District Court instructed that [Gray and McNally's] scheme to defraud the citizens of Kentucky and to obtain money by false pretenses and concealment could be made out by either of two sets of findings:" first, that one Hunt was a defacto state officer with the ability to award an insurance contract to Wombwell Insurance Company, that he had an ownership interest in Seton Investments, Inc., that he directed Wombwell to pay to Seton a portion of the insurance commissions earned by Wombwell on insurance contracts awarded by Kentucky to Wombwell, that he did so without disclosing his ownership interest in Seton "to persons in state government whose actions or deliberations could have been affected by the disclosure," and that Gray and/or McNally aided and abetted Hunt; or second, that Gray had some defacto control over Kentucky's insurance contracts at the time Seton received insurance commissions from the Wombwell contracts, "that Gray had an ownership interest in Seton and did not disclose that interest to persons in state government whose actions or deliberations could have been affected by that disclosure," and that McNally aided and abetted Gray. ___ U.S. at ___, 107 S.Ct. at 2879.
[5] In the Supreme Court, the United States argued that Gray and McNally's convictions should be affirmed even if the Court were to reject the "intangible rights"/"good government" theory. (Brief of the United States at 16-22). The United States so argued because the United States construed the relevant jury instructions (as set forth in the United States' Brief at footnote 8) as requiring that the jury "find a scheme for obtaining money by false or fraudulent pretenses in order to convict and [because] the evidence of a scheme for that purposequite apart from the fraudulent denial of intangible rightsis overwhelming." (Brief of the United States at 18-19). The United States argued that Gray received money and property by false or fraudulent pretenses because Seton received insurance commissions and Gray (and Hunt) controlled and owned Seton. The United States argued that McNally received money channeled to him through another insurance agency. (Brief of the United States at 19).

The Supreme Court accepted that Gray and Hunt were defacto state officers involved in the awarding of insurance contracts by Kentucky and that Gray and Hunt could direct Wombwell to share its insurance commissions with Seton. The court further accepted that Gray and Hunt profited through their ownership interests in Seton when Seton received insurance commissions from Wombwell. ___ U.S. at ___, 107 S.Ct. at 2881. The court also impliedly accepted that Gray and Hunt did not disclose their ownership interests in Seton to the appropriate Kentucky officials. However, the Supreme Court concluded that the jury instructions did not require the jury to find a scheme for obtaining money or other property by false and fraudulent pretenses because "there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property." ___ U.S. at ___, 107 S.Ct. at 2882. Likewise, the jury was not required to find that, absent Gray and McNally's scheme, Kentucky "would have paid a lower premium or secured better insurance.... Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent." Id. No matter what, Kentucky would have paid the full amount of the insurance premium to some insurance agency. Further, and most importantly, the insurance commissions received by Hunt and Gray through Seton were not Kentucky's money, rather they belonged to Wombwell. Id. Thus, Hunt and Gray's alleged fraudulent non-disclosure was directed to Kentucky officials, but Hunt and Gray received money from Wombwell, not Kentucky.
The Court expressly rejected the United States' further argument that Gray and McNally's convictions could be upheld because Gray and McNally "obtained property by means of false representations to Wombwell." Id. at ___ _ ___, 107 S.Ct. at 2882. Nothing in the jury charge required a finding of false representations by Hunt and Gray directed to Wombwell. Id. at ___, 107 S.Ct. at 2884.
Thus, the Supreme Court concluded that the instructions permitted the jury to convict Gray and McNally without finding that they had obtained money from Kentucky by means of false pretenses directed to or the concealment of material facts from Kentucky.
[6] As the Court reads the indictment, paragraphs 6, 7, 8, 9, 10, the first two-thirds of the introductory portion of paragraph 11, and subparagraphs 11(f), 11(g), and 11(o) of Count I, all relate to the "good government"/"intangible rights" scheme. Therefore, these portions of the indictment would have to be stricken as surplusage.
[7] Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), and United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), both involved challenges to convictions on Fifth Amendment grand jury guarantee grounds. In Ex parte Bain, the indictment was amended by striking surplusage. In United States v. Miller, the indictment was not actually amended by striking surplusage, rather the government failed to present proof of certain non-essential allegations of the indictment. However, the Supreme Court implicitly accepted that failure to present proof of allegations is tantamount to striking the allegations and thus that the rule in Ex parte Bain, if still viable, applied.
[8] The viewpoint of this Court (which, of course, is of no consequence in view of McNally) is expressed by Justice Stevens in his dissent:

Perhaps the most distressing aspect of the Court's action today is its casualalmost summary rejection of the accumulated wisdom of the many distinguished federal judges who have thoughtfully considered and correctly answered the question this case presents.
McNally v. United States, ___ U.S. ___, ___, 107 S.Ct. 2875, 2890, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting).